## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. JOEL RABIN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 17-cv-378-JHP-mjx |
| | ) | |
| v. | ) | |
| | ) | |
| 1. THE U.S. ARMY CORPS OF | ) | |
| ENGINEERS, | ) | |
| | ) | |
| 2. ANDREW R. COMMER, in his official | ) | |
| Capacity as Regulatory Office Chief | ) | |
| USACE Tulsa District, | ) | |
| | ) | |
| 3. BARTLESVILLE INVESTMENT | ) | |
| PARTNERS, LLC, | ) | |
| | ) | |
| 4. GBT REALTY CORPORATION, and | ) | |
| | ) | |
| 5. BARTLESVILLE DEVELOPMENT | ) | |
| AUTHORITY, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Joel Rabin, brings this action against Defendants, upon personal knowledge as to their own acts and status, and otherwise upon information and belief based upon the investigation of counsel.

## NATURE OF THE ACTION

**1.** This is a civil action for declaratory and injunctive relief for violations of Section 404 of the Federal Water Pollution Control Act (commonly known as the Clean Water Act and hereinafter referred to as the "CWA") and failure to comport with the requirements of the National Environmental Policy Act (herein "NEPA") brought under the

1

Administrative Procedure Act (herein "APA"), regarding the U.S. Army Corps of Engineers' (herein "Corps" or "ACOE") decision on or around May 31, 2017, to issue a permit (herein the "404 Permit") allowing for the discharge of dredged or fill material into jurisdictional waters of the United States.   The permit was requested for the development of the Silver Lake Village commercial retail shopping center in Bartlesville, Oklahoma.

2.      The Corps failed to comply with federal law (CWA, 33 USC § 1251, *et seq*.) by failing to analyze reasonable and practicable alternatives which would avoid, minimize, and mitigate wetland impairment for the proposed action and have, thus, not ensured that the permitted action is the Least Environmentally Damaging Practicable Alternative, thereby abdicating its statutory responsibility.

3.      The Corps failed to comply with federal law (NEPA, 42 USC § 4321, *et seq.*) in its review of alternatives to the proposed action due to improper scoping and inadequate objectivity in assessing Applicants' proffered information.

4.      The Corps failed to comply with federal law (APA, 5 USC § 500, *et seq.*) in its granting of the 404 Permit as its decision was arbitrary and capricious and not based upon substantial evidence.

5.      Plaintiff seeks a declaration that the 404 Permit was issued in violation of the CWA, NEPA, and APA, as well as an order vacating all existing authorization granted under the 404 Permit until full compliance with federal law is ensured.

6.      Plaintiff seeks injunctive relief to prohibit the fill of jurisdictional waters until and unless a properly-issued permit may be obtained.

## INTRODUCTION

**7.**     This Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331.  The relief requested is authorized pursuant to 33 U.S.C. §§ 1319 and 1365(a) and 28 U.S.C. §§ 2201 and 2202.

**8.**     Venue is appropriate pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of all violations complained of have occurred in the District.

## PARTIES

**9.**     Plaintiff, Joel Rabin (herein "Plaintiff" or "Rabin") is a resident of Bartlesville, Oklahoma, and is an avid outdoorsman and enjoys the various natural and scenic elements which Washington County and the rest of Oklahoma provide.  In addition to regularly hiking through the woods and along the waterways of the area, Mr. Rabin is a long-time fishing enthusiast.  Mr. Rabin frequently fishes the waters within Oklahoma including the waters close to Bartlesville.  On the Caney River, and in compliance with the terms of his fishing license, Mr. Rabin has fished and expects to fish in the future. The Caney River provides substantial value to Mr. Rabin due to its recreational and scenic opportunities.  The waters flowing through Bartlesville afford Mr. Rabin and countless other community members a unique chance to experience and explore nature's beauty within their own hometown.  In addition to fishing on the Caney River, Mr. Rabin also enjoys hiking along its banks and generally enjoying the experience which flowing water affords; providing a chance to clear his mind and escape to nature.  Mr. Rabin hopes and intends to continue his enjoyment of the Caney River in the future.

3

10.     Defendant Corps is a federal agency tasked with evaluating applications for Section 404 permits under the CWA and for ensuring that the requirements of the CWA are fulfilled in any permits issued pursuant thereto.

11.     Defendant Andrew R. Commer is the Chief Regulatory Officer in the Corps' Tulsa District and is sued in his official capacity as he supervises all Tulsa District actions.

12.     Defendant Bartlesville Investment Partners, LLC, (herein "BIP") is a Foreign Limited Liability Company registered with the Oklahoma Secretary of State to lawfully conduct business in Oklahoma.  The Company was formed in 2016 and principally based in the State of Georgia.

13.     Defendant GBT Realty Corporation (herein "GBT") is a foreign business entity not registered with the Oklahoma Secretary of State to conduct business in Oklahoma. GBT's principal place of business is in Tennessee.

14.     Based upon information and belief, Mr. Rabin understands that GBT formed BIP to lawfully conduct business within Oklahoma and, separate business structures notwithstanding, BIP is a branch of GBT.

15.     The Bartlesville Development Authority (herein "BDA") is a Public Trust registered with the Oklahoma Secretary of State.

16.     Together BIP, GBT, and the BDA (herein "Applicants") have collaborated in the development of the Silver Lake Village project and, collectively, sought the 404 Permit from the Corps.  Applicants are joined as defendants in this action pursuant to Federal Rules of Civil Procedure 19(a) and 20(a) as they likely claim an interest in the challenged permit.  Plaintiff does not allege, at this time, any violation of law by the Applicants

pertaining to the 404 Permit.  Applicants are joined at this time to eliminate the need for

Applicants to intervene at a later date to protect their interest in the challenged permit.

Additionally, Mr. Rabin seeks to enjoin the Applicants from undertaking the actions

authorized by the 404 Permit—the destruction of federally-protected water bodies—until

such permit comports with federal procedural and substantive requirements.

### BACKGROUND AND FACTS

17.     The Caney River bisects the City of Bartlesville in a north-south manner.  After

flowing through Bartlesville in a generally southern direction, the Caney River joins the

Verdigris River near Claremore, Oklahoma.   The Verdigris continues in a southern

direction and serves the Port of Catoosa before meeting the Arkansas River near

Muskogee, Oklahoma.  The waters flowing through Bartlesville are, themselves, directly

connected to interstate commerce.  There are numerous tributaries of the Caney River

which pass through or originate within Bartlesville and the actions of individuals and

public and private entities have a significant impact on these tributaries.

18.     The Silver Lake Village development is largely within the 100-year floodplain of

the Caney River and contains numerous ephemeral streams and delineated wetlands.  An

unnamed tributary of the Caney River passes between the development and the

intersection of Adams Boulevard and Silver Lake Road.  This tributary has been routed

through various culverts and is subject to numerous engineering modifications to

accommodate prior developments.  The boundary of the development is within 200 feet

of this tributary and multiple delineated wetlands within the proposed development lie

within 300 yards of it.  Along the southern boundary of the development passes a separate

unnamed tributary to the Caney River. Numerous wetlands are adjacent to this tributary and several ephemeral streams within the development discharge into it.

19. The CWA serves as the cornerstone for surface water quality protection in the United States. Its foundational purpose is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251.

20. The CWA prohibits discharges of dredged or fill materials into waters of the United States without a permit. 33 U.S.C. § 1311(a); 33 U.S.C. § 1344(a).

21. Waters of the United States, as defined in § 404, includes wetlands, which are areas "inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b).

22. The Caney River is surrounded by jurisdictional wetlands and the acreage proposed to be developed by the Applicants contains a substantial amount of delineated jurisdictional wetlands and waters.

23. Section 301 of the CWA, 33 U.S.C. § 1311(a), states that "the discharge of any pollutant by any person shall be unlawful," unless such discharge is permitted. Section 404 permits, issued by the Corps, regulate the discharge of dredged and fill materials.

24. The CWA defines "pollutant" to include rock, sand, and biological materials. 33 § U.S.C. 1362(6). Moreover, the term "pollution" includes "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19). Additionally, "discharge of fill material" includes "placement of fill that is necessary for the construction of any structure or infrastructure in a water of the

6

United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses . . . ." 33 C.F.R. § 323.2(f).

25.     Within the development, four discrete Phases are planned.     Phase 1 is a commercial development and is the subject of a separate legal challenge by Plaintiff (*See Rabin v. Bartlesville Development Authority, et al*, Northern District of OK, Case No. 17-cv-93-GKF-FHM) and is not specifically at issue in this current action.

26.     Phases 2, 3, and 4 cover 77 acres of land and contain more than 16 acres of wetlands and ephemeral streams which have been deemed jurisdictional by the Corps and are indisputably subject to §404 protections before any fill therein may be permitted.

27.     The Corps provided Public Notice of the §404 application and permitting process on or about December 13, 2016.   The Public Notice contained no information as to alternatives to the proposed action.

28.     Mr. Rabin provided a Public Comment to the Corps which addressed many of his concerns and expressly requested a public hearing.   Mr. Rabin received no substantive response from the Corps regarding his Comment.   To date, Mr. Rabin has no indication the Corps even reviewed his Comment.

29.     Mr. Rabin made various requests for relevant documents and requested notice of the permitting process though was advised by the Corps that such documents would only be provided under a Freedom of Information Act (herein "FOIA") request.   Simple FOIA requests might not receive a substantive response for twenty (20) business days. *See 5 USC § 552 et seq.*  Additionally, Mr. Rabin was informed that it was the District's policy

to not provide individual notice to interested parties. However, to facilitate public engagement and involvement in the NEPA process, the Corps is required to "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected [and] the agency shall mail notice to those who have requested it on an individual action." 40 CFR § 1506.6(b).

30.     As the development lies almost entirely within the floodplain of the Caney River, it is subject to local zoning and building requirements specifically addressing floodplain concerns, including: 1) construction may not result in a net rise in the water elevation during a 100-year flood event; 2) new development must be 12" above base flood elevation; and 3) compensatory storage must be provided at a 1:1 ratio for any fill within the parcel.

31.     Applicants' proposed plans call for land grading activities, paving, and building within delineated waters and the Corps' 404 Permit authorizes this fill.

32.     Specifically, the Applicants requested—and the 404 Permit grants—authorization to fill a wetland which is referred to as "Wetland D" and also to fill a stream which is referred to as "S1" to allow for the construction of commercial retail spaces in Phase 2 of the development.

33.     Wetland D and S1 are jurisdictional waters and, thus, fill of these bodies is lawful only if a §404 permit is issued by the Corps authorizing such.

34.     The Corps is prohibited from issuing such a permit, based upon a §404 application, if:

8

(i)     There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or

(i)     The proposed discharge will result in significant degradation of the aquatic ecosystem under § 230.20(b) or (c); or

(ii)     The proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem; or

(iii)     There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines.

40 CFR § 230.12(a)(3).

**35.**     The Corps is required to make factual findings regarding the Guidelines found in 40 CFR § 230.12(a)(3) prior to permit issuance.

**36.**     Before a §404 permit may be issued, the Corps must ensure that all practicable wetland *avoidance* has been accomplished. After all practicable wetland avoidance has been exhausted, all wetland impacts must be *minimized*. Only after wetland avoidance **and** impact minimization have been secured can the Corps "offset" adverse wetland impacts through *mitigation*.

**37.**     The 404 Permit allows for development of Phase 2 which entails approximately 86,453 square feet of retail space and ensuing parking, roadway, landscaping, and infrastructure support of this retail space.

**38.**     Applicants' original master development plans, developed during or before 2015, proposed the construction of multi-family housing, public green space, public park areas, and public hiking trails within Phases 3 and 4.

39.     The Applicants have no firm proposals for development of multi-family housing, public green space, public park areas, or public hiking trails within Phases 3 and 4.

40.     The Corps is required to assess alternatives to the proposed action, pursuant to NEPA, in the aims of disclosing foreseeable negative environmental aspects of the development in light of reasonable and practicable alternatives.  *See* 42 USC § 4332(C); 40 CFR § 1508.9.

41.     The Corps is required to "[r]igorously explore and objectively evaluate **all** reasonable alternatives" to the proposed action.  40 CFR § 1502.14(a) (emphasis added).[1]

42.     The failure of a federal agency—such as the Corps—to comply with NEPA procedure results in a presumption of harm to the environment.  *See Davis v. Mineta*, 302 F.3d 1104, 1114-1115 (10th Cir. 2002).

43.     Since the proposed development is not water-dependent, there is a presumption that practicable alternatives exist and that such alternatives will be less environmentally damaging.  *See* 40 CFR § 230.10(a)(3).  It is the Applicants' burden to overcome these presumptions, which must be demonstrated clearly, and this must be independently verified by the Corps before a §404 permit may be issued.   *See id*.

---

[1]     Mr. Rabin understands that the Corps elected to not undertake an Environmental Impact Study (herein "EIS").  Even so, the statutory language applicable to an EIS is instructive as to the Corps' duty to conduct an analysis of alternatives to the proposed action under an Environmental Assessment (herein "EA").   Mr. Rabin understands that the rigor of an alternatives analysis required within an EA will be less than that required under an EIS.   However, as an alternatives analysis is expressly required under the CWA which is to be undertaken in conformance with NEPA standards, and there is a presumption that a preferable alternative exists and that presumption must be overcome "clearly", Mr. Rabin contends that the more rigorous EIS alternatives analysis is the only standard which is applicable.  See 40 CFR § 230.10(a)

44.    The Corps is required to assess alternatives to the proposed actions, pursuant to the CWA, and is precluded from approving Applicants' requested action unless it is determined to be the Least Environmentally Damaging Practicable Alternative.

45.    The Corps is required to provide "a detailed statement **by the responsible official**" for "alternatives to the proposed action." 42 USC § 4332(C) (emphasis added). In the Corps' Memorandum of Record, the only statements regarding alternatives which are even remotely substantive were not statements from "the responsible official" as 42 § USC § 4332(C) requires but were, instead, statements **from the Applicants** from private emails between the Corps and the Applicants.  If the Applicants were allowed to prepare and submit the environmental documents for the Corps' adoption, the Corps is required to "make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment."  40 CFR § 1506.5(b).

46.    In addition to not being "detailed statements" and not being made "by the responsible official", this information was not available to the public nor to the agency during the Public Comment period.  Instead, it only became known to the Corps <u>after</u> drafting of the final permit had commenced, and it only became known to Mr. Rabin through a FOIA request.  This information relates to some nebulous "alternatives" not independently verified by the Corps nor made known to the public.

47.    The Corps, pursuant to Executive Orders 11988 and 13690, is not to assist or approve development within a floodplain so long as practicable alternatives are available outside the floodplain.

48.     If no practicable alternatives exist outside the floodplain, the Corps "**shall** consider, as a means of mitigation, alternatives within the floodplain which will lessen any significant adverse impact to the floodplain."  33 CFR § 320.4 (l) (emphasis added).

49.     The original §404 application, submitted by the Applicants, contained various errors and conflicting information—at odds with the contents of the application itself as well as contrary to what had been previously promoted to the public.

50.     Since the original 2015 master development plan was drafted, the Applicants were informed by the City of Bartlesville that the City's floodplain building requirements mandate an access road to the tentatively-proposed multi-family housing.  This roadway and its accompanying infrastructure have implications for development in the tract due to the amount of fill material required to raise the road the required 12" above base flood elevation.  Floodplain considerations limit the amount of fill which can be placed within the tract and such a roadway would effectively preclude other development from occurring within the tract.

51.     The Corps states that the basic purpose of Phases 2, 3, and 4 is to construct a commercial retail development.

52.     Approximately 10 acres within Phases 2, 3, and 4—out of 77 acres in total—is planned for commercial retail development.

53.     Phases 2, 3, and 4 represent an independent project and are not a link within a project.

54.     The Corps' evaluation of any alternative proposed by the Applicants included the alternative's ability to accommodate public hiking trails and multi-family housing, both

12

of which are not viable, practically or economically, within the Silver Lake Village development.  In fact, the Corps **prohibits** such a hiking trail from being established in the proposed area and the City's zoning requirements effectively preclude construction of the proposed multi-family housing.

55.    Alternatives which were proposed and analyzed—by the Applicants and by the Corps—were evaluated as to their ability to accommodate a development which is larger and broader in scope than the currently proposed action and thereby otherwise viable alternatives were presented as unviable alternatives.  The Corps failed to conduct any evaluation that excluded public hiking trails and multi-family housing.

56.    On-site alternatives which did not include footprints for hiking trails and multi-family housing were not evaluated even though the Applicants acknowledge that neither of those features is viable.

57.    Defendants contend, without substantial evidentiary basis, that no on-site alternatives to the proposed design are practicable and would have a lower environmental impact.

58.    Defendants contend, without substantial evidentiary basis, that no off-site alternatives to the proposed design are practicable and would have a lower environmental impact.

59.    Applicants state that—to build their desired commercial project—they must fill certain federally-protected water bodies in order to comport with local zoning requirements, in effect, usurping federal laws though local zoning requirements.

60.     Applicants and the Corps have failed to overcome the presumption of available alternatives for the non-water-dependant activities.

61.     During the 2015 scoping of the project, practicable alternative locations existed within the Bartlesville area which could have fulfilled the basic purpose of the Silver Lake Village development which could have avoided wetland and environmental harms.

62.     Throughout the entire pre-application process, practicable alternative locations existed within the Bartlesville area which could have fulfilled the basic purpose of the Silver Lake Village development which could have avoided wetland and environmental harms.

63.     During the permitting phase, practicable alternative locations existed within the Bartlesville area which could have fulfilled the basic purpose of the Silver Lake Village development which could have avoided wetland and environmental harms.

64.     The Corps did not consider, at least not prior to actual drafting of the permit had already begun, any alternative locations outside of the floodplain where a commercial retail development could be established.

65.     The Corps did not consider alternatives within the floodplain which might mitigate adverse impacts to the floodplain.

66.     The Corps has not ensured that wetland impacts, even if unavoidable, have been minimized.  The 404 Permit provides nebulous statements that minimization has been accomplished but no details are included.

67.     The Corps has not ensured that wetland impacts, even if unavoidable and minimized, have been properly mitigated.  The 404 Permit provides a compensatory

mitigation summary of the project but the criteria which the ACOE ostensibly follows is a deviation from the Tulsa District's published Aquatic Resource Mitigation and Monitoring Guidelines.

## COUNT I

### Violation of NEPA for Failure to Consider Reasonable Alternatives

**68.**    Plaintiff incorporates all preceding paragraphs by reference.

**69.**    The ACOE is required to "rigorously explore and objectively evaluate all reasonable alternatives" to the Applicants' proposed action and "devote substantial treatment to each alternative [and] evaluate their comparative merits."  *See* 40 CFR § 1502.14; 40 CFR § 230.10(a)(4); *see also* 40 CFR 1505.1(e) (mandating "that the alternatives considered by the decisionmaker are encompassed by the range of alternatives discussed in the relevant environmental documents. . . .").

**70.**    If the ACOE conducted any off-site alternatives evaluation it was not done before drafting of the permit had begun.  The ACOE's "evaluation" is, at best, a post hoc rationalization and, at worst, a complete abdication of its duty.  *See* 40 CFR § 1502.5 (requiring that the analysis be "early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made").

**71.**    No alternatives were provided to the public for consideration, review, or comments during the Public Comment period, thereby preventing meaningful participation from the community.  *See* 40 CFR § 1500.1(b) (requiring that "environmental information is available to public officials **and citizens** before decisions are made and before actions are

15

taken.") (emphasis added).   In his Public Comment, Mr. Rabin noted the lack of alternatives presented by the Applicants and requested the public be provided alternatives for review and comment though Mr. Rabin received no response, much less any alternatives for review.

72.     Any off-site alternatives which were evaluated were assessed as to their ability to accommodate features which the Applicants admit are not feasible within the proposed action and the ACOE has, therefore, failed to evaluate the "comparative merits" of the alternatives.   *See* 40 CFR § 1502.14(b).   In effect, the ACOE required alternatives to provide more services and benefits than the Applicants' proposed action possibly could.

73.     The ACOE has not rigorously explored alternative on-site building layouts for the Silver Lake Village which would allow development but avoid the protected water bodies.   If alternative site layouts were eliminated, the ACOE was required to briefly discuss why such on-site alternatives were eliminated from detailed study.   *See* 40 CFR § 1502.14(a).   For instance, the ACOE has not explained why the retail development— constituting but a fraction of the total area—could not be shifted within the parcel to avoid being sited over the wetlands.   Or, alternatively, the ACOE has not explained why the Applicants could not simply forgo the particular construction activities which are proposed to occur directly over the protected water bodies.

74.     The ACOE allegedly evaluated a "no action alternative" which was based upon no development within the 77 acre parcel containing Phases 2, 3, and 4 of the Silver Lake Village.   The selected "no action alternative" impermissibly overlooks a "no action alternative" which entails reconfiguration of the project to avoid wetlands on the site

though still allows construction on all upland areas and, thus, fails to address reasonable and practicable on-site alternatives.

75.     By failing to timely and adequately consider both on-site and off-site alternatives "in comparative form" (*see* 40 CFR § 1502.14) and without "evidence that the agency has made the necessary environmental analyses" (*see* 40 CFR § 1502.1), the ACOE has violated NEPA, leading to a presumption of environmental harm, and the agency's final action must be set aside.

## COUNT II

### Violation of the CWA for Failure to Consider Reasonable Alternatives

76.     Plaintiff incorporates all preceding paragraphs by reference.

77.     The ACOE was required to assess practicable alternatives under the CWA in much the same manner as was required under NEPA.  40 CFR § 230.10(a)(4).  However, under the CWA, the Corps is **prohibited** from permitting the Applicants' proposed action without a determination that it is the Least Environmentally Damaging Practicable Alternative.  *See* 40 CFR § 230.12(a)(3); 40 CFR § 230.10(a)(3).

78.     Neither the Applicants nor the Corps has "clearly demonstrated" that practicable alternatives—both on-site **and** off-site—to the proposed action do not exist and no permit may be issued until so demonstrated.  40 CFR § 230.10(a)(3).

79.     The allegedly-assessed "no action alternative" supposes no development throughout all of Phases 2, 3, and 4 but does not contemplate full build-out throughout the tract except for the discrete areas occupied by federally-protected waters.  This fails to rebut the presumption that an alternative exists: a "no action alternative" which applies

the "no action" standard only to delineated waters and without limitations to the upland areas.

**80.**     The Corps has provided no indication that it independently reviewed any of the alternatives under any level of scrutiny.  Moreover, this alleged alternatives analysis was not conducted before permit issuance had already begun.  By failing to adequately assess practicable alternatives and by permitting an action without making required evidentiary findings, the Corps has violated the CWA and the final agency action must be set aside.

## <u>COUNT III</u>

### Violation of the CWA for Failure to Ensure all Avoidance, Minimization, and Mitigation of Adverse Wetland Impacts

**81.**     Plaintiff incorporates all preceding paragraphs by reference.

**82.**     The Corps failed to ensure that **<u>all</u>** practicable wetland avoidance was accomplished.  An inadequate review of practicable alternatives incurably taints the Corps' assessment of the Applicants' avoidance efforts.  Moreover, this required avoidance applies to *all* protected waters within the tract; it is inadequate that *some* of the impacts were avoided.  The Corps failed to meet its regulatory burden with the austere claims that, through pre-application communications, wetland avoidance has been achieved.  Rather than avoiding *some* of the wetlands, the Applicants must avoid *all* of the wetlands if they can reasonably do so.  If such avoidance is not practicable, a detailed statement is required to indicate as such.  In addition to not ensuring all practicable avoidance was accomplished, the Corps also failed to provide a statement regarding wetlands impacts that are—allegedly—unavoidable.

83.     After—and only after—all avoidance measures have been ensured, the Corps must

see that all minimization efforts are undertaken.  The Corps failed to provide a detailed

statement regarding any minimization efforts and thereby failed to comport with CWA.

84.     If any adverse impacts remain after all avoidance and minimization options have

been exhausted, the Corps is required to mitigate all remaining impacts in furtherance of

the goal of "no net loss" of wetlands.  The Corps failed to make a determination that the

approved compensatory mitigation measures adequately meet this goal.  The Corps did

not develop the mitigation measures but, instead, adopted the Applicants'

recommendations lock-stock.  Rather than making a determination that the proposed

mitigation was adequate to compensate for adverse wetland impacts, the Corps merely

stated that its guidelines had been followed by the Applicants.  While certain guidelines

*may* have been followed, the Tulsa District's guidelines were not.  Even so, the Corps is

required to assess the adequacy of the mitigation measures as they pertain to this 404

Permit, which the Corps failed to do.  There is nothing in the record to indicate the Corps

independently verified the contents of the Applicants' proposed mitigation measures

before Corps approval.

85.     The Corps was required to make a determination that the permitted action was the

Least Environmentally Damaging Practicable Alternative.  The Corps never made such a

determination and, therefore, failed to comply with the strict requirements of the CWA.

*See* 40 CFR § 230.12(a)(3).

## COUNT IV

### Violation of the APA

19

**86.**    Plaintiff incorporates all preceding paragraphs by reference.

**87.**    The Corps' final agency action, issuance of the 404 Permit, was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law, all in violation of the APA, and therefore must be set aside.

**88.**    Applicants concede they seek to eliminate protected waters in order to comport with local zoning codes which apply to construction within the floodplain.  Applicants seek to utilize Bartlesville's zoning codes to effectively eliminate practicable alternatives from the Corps' consideration.  Bartlesville's cut-and-fill limitations cannot serve as the basis to remove an otherwise practicable alternative from the purview of the ACOE. Specifically, "the term *Practicable* means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."  40 CFR § 230.3(l) (note that compliance with local regulatory requirements are not included in the definition).  The CWA does not preclude municipalities from adopting zoning requirements for the protection of floodplains and the wetlands contained therein but such local ordinances cannot serve as the basis to *weaken* federal mandates.  The area within the proposed Silver Lake Village development can be subject to local zoning requirements and federal wetland regulation but, when these two regulatory frameworks intersect, the local must bend to the federal or run afoul of the Supremacy Clause.  Any consideration which the ACOE has given to local zoning ordinances which acts to subvert the protections of the CWA is unconstitutional.  Apart from complying with **local** zoning requirements, there is no reason for Applicants to fill S1.  S1 is **federally-protected** and must remain so irrespective of local decision-making.

89.    The Corps failed to comply with its own floodplain regulations by permitting a development within a floodplain without assessing practicable alternative locations outside the floodplain and, where practicable, requiring advancement of such alternatives. Moreover, even if out-of-floodplain locations were not available, the Corps was required to ensure adverse floodplain impacts were minimized.  33 CFR § 320.4 (l)(2).  Specific traits such as water resources, living resources, cultural resources, and cultivated resources are to be "restored and preserved."[2]  *Id*.  The Corps failed to comport with the letter of its regulations and the spirit of the applicable Executive Orders which seek to floodplain impacts which, individually perhaps small, have a large cumulative effect.  No reasoned basis for this deviation from agency regulation was provided.

90.    The Corps' failure to comply with the procedural and substantive requirements of NEPA, and therefore the CWA as well (*see* 40 CFR § 230.10(a)(4)), prevented robust public involvement, including from Mr. Rabin.   These failures include, without reservation:

a.    No off-site alternatives were considered by the Corps until drafting of the final permit had already begun;

b.    No off-site alternatives were presented to the public for comment;

c.    No detailed statement for each off-site alternative was provided by the agency;

d.    No on-site alternatives were presented to the public for comment;

---

[2]    These traits include flood attenuation, water quality maintenance, ground water recharge, wildlife and plant resources, open space, natural beauty, scientific study, outdoor education, recreation, and forestry.  *See* 33 CFR § 320.4 (l)(1).

e.      No independent and rigorous analysis was conducted by the Corps for any alternative; and

f.      The "no action alternative" impermissibly and arbitrarily presumed no development *could* occur within the 77-acre tract if development were not permitted within Wetland D and S1.

91.    The Corps failed to comply with the requirements of the CWA by permitting the fill of jurisdictional wetlands when the proposed action had not been demonstrated to be the Least Environmentally Damaging Practicable Alternative.  Even if the proposed action *could* be considered to be the Least Environmentally Damaging Practicable Alternative, neither the Corps nor the Applicants have "clearly demonstrated" this to be the case and, therefore, no permit may be issued.

92.    The 404 Permit, issued by the Corps, was in response to an October 21, 2016 §404 application submitted by the Applicants.  In his Public Comment, Mr. Rabin highlighted numerous inaccuracies and omissions within the application – inaccuracies and omissions which have substantive bearing on the requested permit.  Mr. Rabin received no response from the Corps regarding these errors and the Corps has made no statement as to their reliance on the mis-information in the application.  To the extent the Corps relied on or failed to notice the incorrect statements and submissions of the Applicants, this goes to show the lack of an independent and rigorous analysis as is required by law, especially after these inaccuracies were brought to the agency's attention.  Moreover, this fails to meet the required substantial evidentiary basis for agency decision-making.

93.    In his Public Comment, Mr. Rabin noted the inadequate alternatives, the inadequate avoidance measures, the inadequate minimization efforts, and the inadequate mitigation efforts but he received no substantive response from the Corps.  Mr. Rabin specifically requested that the Public Comment period be re-opened after the Applicants had addressed each of these concerns.  Not only was the Comment period not re-opened, but the Corps' issued permit failed to address these fatal flaws.

94.    The Tulsa District Corps acted arbitrarily in deviating from its published Aquatic Resource Mitigation and Monitoring Guidelines when it elected to reward the Applicants with both "Restoration" and "Preservation" compensatory mitigation credits for Stream "S3".  Further, the Tulsa District deviated from these same Guidelines by providing more than ½ of the project's mitigation credits for "preservation" even though their own guidelines state that preservation credits "should not exceed 50 percent of the total mitigation package."  *See* U.S. Army Corps of Engineers, Tulsa District, Aquatic Resource Mitigation and Monitoring Guidelines, available at http://www.swt.usace.army.mil/Portals/41/docs/missions/regulatory/mitigation/MMG.pdf, page 4.  No detailed explanation was provided for this deviation from District policy.

95.    The Tulsa District Corps acted arbitrarily in deviating from the 1990 Memorandum of Agreement between the U.S. Environmental Protection Agency and the Corps when it permitted wetland fill without exhausting all wetland avoidance options. The Corps further acted arbitrarily, and not in conformance with established policies, by not exhausting all adverse wetland impact minimization.  The Tulsa District deviated yet further by failing to ensure that the Corps-approved mitigation measures fully

compensate for the Applicants' adverse wetland impacts.  No detailed explanation was provided for this deviation from agency policy.

**96.**     As the Corps failed to follow federal law, failed to comport with agency policy and regulation, failed to comply with District-level guidelines, failed to make required evidentiary findings, incorporated factors it was not authorized to consider, acted in an unconstitutional manner, and acted without substantial evidence, the agency's final action must be set aside as arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.

## COUNT V

### Preliminary Injunction

**97.**     Plaintiff incorporates all preceding paragraphs by reference.

**98.**     Applicants' proposed fill activity is unlawful absent a properly authorized permit from the ACOE.  Such fill, with or without a permit, will have substantial and adverse chemical, biological, and physical impacts on the natural resources present within and around the Silver Lake Village development.  Until the fill has been demonstrated to be the Least Environmentally Damaging Practicable Alternative, no permit should issue and no fill should occur.

**99.**     The Corps issued the 404 Permit without complying with federal mandates and has, thus, not ensured the required protection of these water bodies and the waters of the United States.  Any fill by the Applicants, in purported conformance with this permit, will be based upon inadequate or entirely absent assurances and will not comport with federal requirements to avoid, minimize, and mitigate the deleterious impacts of wetland fill.

24

100.    Applicants' proposed construction and grading activities call for the permanent fill and destruction of these water bodies.  Such fill is incapable of being fully cured through monetary compensation (*i.e.* after-the-fact mitigation measures) and, once filled, these water bodies—in their current form—will be permanently lost.

101.    The permanent loss of these wetlands, certain to occur if Applicants are allowed to proceed with their proposed construction activities ostensibly authorized by the 404 Permit, far outweighs any temporary inconvenience the Applicants may experience while the adequacy of the permit is assessed.

102.    Public Interest favors the protection of wetlands and waters of the United States over the interest of one particular commercial developer.  This can be noted within the declared goal of the Nation and the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's water."  33 U.S.C. § 1251(a).  Preservation and stewardship of wetlands and ephemeral streams far outweighs the rapid construction of the proposed commercial development.

103.    Accordingly, until the substantive basis of any permit can be ascertained and the required avoidance, minimization, and mitigation efforts can be demonstrated, Applicants should be enjoined from filling the delineated water bodies.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court grant Plaintiff the following relief:

A.    Issue a declaratory judgment that the Corps has violated federal law under NEPA, CWA, and APA;

B.    An order vacating all authorization purportedly granted by the 404 Permit;

C.    Enjoin Applicants from discharging any pollutants, including dredged and fill materials, into protected waters;

D.    Award Plaintiff his costs and reasonable attorneys fees incurred in this action; and

E.    Award such other relief as this Court deems appropriate.

Respectfully Submitted,

_____
Jason B. Aamodt, OBA No.16974
Krystina E. Phillips OBA No. 30111
Dallas L.D. Strimple OBA No. 30226
Matthew D. Alison OBA No. 32723
INDIAN AND ENVIRONMENTAL
LAW GROUP, PLLC
9 East 4th St. S., Suite 204
Tulsa, Oklahoma 74103
Tel: (918) 347-6169